**Kyle S. HAMILTON, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 37A03–0507–CR–345.

Court of Appeals of Indiana.

April 24, 2007.

Hamish S. Cohen, Matthew S. Winings, E. Timothy DeLaney, Barnes & Thornburg, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Scott L. Barnhart, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-defendant Kyle Hamilton appeals her convictions for Fraud on a Financial Institution,[1] a class D felony, Exploitation of an Endangered Adult,[2] a class D felony, Financial Exploitation of an Endangered Adult,[3] a class D felony, Forgery,[4] a class C felony, six counts of Conversion,[5] a class A misdemeanor, and Theft,[6] a class D felony. Specifically, Hamilton argues that the convictions must be reversed because the trial court abused

---

1. Ind.Code § 35–43–5–8.

2. Ind.Code §§ 35–46–1–12(b)(1), -(12)(b)(2).

3. I.C. § 35–46–1–12(c).

4. I.C. § 35–43–5–2(4).

5. I.C. § 35–43–4–3.

6. I.C. § 35–43–4–2.

its discretion in denying her motion for continuance. Moreover, Hamilton claims that she was deprived of her right to due process because she was not informed of all of the charges against her until the day before trial. Finding no error, we affirm the judgment of the trial court.

## FACTS

Ned Tonner is an attorney in Rensselaer who, at some point, performed legal work for Jiggs Kobek. Years later, Kobek consulted with Tonner about her sister, Martha Ham. Kobek had power of attorney over Ham and was concerned about Ham's failing health. In September 2000, Ham and Hamilton—Ham's daughter—approached Tonner about revoking Kobek's power of attorney. Following the consultation, Tonner prepared documents revoking Kobek's position and appointing Hamilton in Kobek's place. On September 11, 2000, Ham executed the "Martha E. Ham Revocable Living Trust Agreement." Tr. p. 112. Tonner instructed Ham and her daughter to transfer all of Ham's assets to the trust.

When Ham's health began to deteriorate, Hamilton—who lived in California—contacted Tonner regarding her mother's inability to care for herself. In response, Tonner suggested that Hamilton petition for guardianship of her mother. Thereafter, Tonner spoke with Ham, who indicated that she did not want a guardian. Tonner then urged Hamilton to hire her own attorney, which Hamilton did. Hamilton eventually filed a petition for guardianship, and on February 20, 2001, the petition was granted. The trial court ordered that Ham was to remain in Indiana as long as she was able. Tonner wrote Ham a letter on February 22, 2001, explaining the results of the proceeding and informing her that her assets totaled $227,806.

Ham's condition began to worsen, and Hamilton hired Tonjua Gray to care for Ham. Hamilton directed that Ham's bills should be transferred to her in California. At some point, Gray noticed that Hamilton "would not pay the bills." Tr. p. 249. Indeed, Gray observed that a number of shut-off notices regarding the electricity, cable television, and telephone had been sent to Ham's residence. As a result, Gray approached Tonner.

On February 28, 2002, Tonner filed requests to have Hamilton removed as Ham's guardian and to revoke her power of attorney. Tonner also prepared and filed a subpoena duces tecum requesting that Hamilton send him all bank statements, deposit slips, checkbook ledgers, and all other financial records relating to Ham that were dated between February 20, 2001, and February 2002. However, Tonner never received a response from Hamilton. Tonner and Hamilton's attorney reached an agreement that Tonner would withdraw from the matter if attorney John Potter could be appointed to act as Ham's guardian ad litem and conduct an investigation. An "agreed order" dated March 7, 2002, stated that Hamilton was not to transfer any assets owned by Ham or the trust from National City Bank to any other bank. Ex. 8.

Thereafter, Potter spoke with Hamilton and other individuals concerning Ham's financial affairs. Potter noted that on May 29, 2001, $93,304.49 had been wired from the National City Bank trust account to a bank in California. Potter also noticed that several unexplained "large round sum checks" had been written on the account. Tr. p. 165–66. It was determined that between October and December 2001, Hamilton used a debit card that had been issued to the trust account an average of twenty-five times per month at California restaurants. By March 2002, the amount

that had been transferred from the trust account was reduced to $800.

In April 2002, Potter became concerned when Hamilton indicated that she needed "liquid funds" in order to care for Ham. *Id.* at 155, 158, 380. Hamilton explained to Potter that she had used some of the money from the trust account to fund an "unconventional investment" that involved a remodeling of her backyard and garden area. *Id.* at 158, 237, 362–63, 403. Specifically, Hamilton indicated that she intended to rent the space to movie and television studios in southern California that wanted to shoot outdoor scenes. Later that month, Potter filed a report with the trial court recommending that Hamilton be replaced as Ham's guardian. As a result, on August 13, 2002, attorney Richard Comingore was appointed as the guardian.

The order appointing Comingore as guardian provided that he was to receive the funds necessary to pay outstanding hospital bills from Hamilton as trustee. However, Comingore did not receive any funds from Hamilton or notification that the bills had been paid. Hence, Comingore filed a petition to docket the trust and remove Hamilton as trustee. On August 23, 2002, the trial court granted both requests and appointed Comingore as successor trustee. Hamilton was ordered to garner all personal and trust assets and transfer them to Comingore. However, Comingore never received any money, reports, or an accounting regarding the assets.

On September 3, 2002, Hamilton drove to a National City Bank branch in Merrillville and spoke with a manager. Hamilton indicated that she was having "problems" with the Rensselaer branch regarding the withdrawal of funds from Ham's account.

Tr. p. 262. Hamilton stated that she had been removed as power of attorney over Ham's account. Although Hamilton attempted to cash a check at the Merrillville branch, the manager informed her that she could not write a check on the account because she no longer had power of attorney over Ham. The manager further indicated that the only way that Hamilton could obtain funds would be for Ham to write a check. Hamilton then left the bank and returned a short time later with a check signed by Ham and written to her in the amount of $1600. As guardian and trustee, Comingore had not given anyone permission to remove that money from Ham's account.

On October 22, 2002, the State charged Hamilton with fraud on a financial institution as a class C felony[7] under cause number FC–507. Thereafter, on May 6, 2003, Hamilton was charged with exploitation of an endangered adult as a class D felony, financial exploitation of an endangered adult as a class D felony, and forgery as a class C felony in cause number FC201. And on April 6, 2004, the State charged Hamilton with six counts of conversion as a class A misdemeanor and two counts of theft as a class D felony under cause number FD–126. The trial court ultimately granted Hamilton's motion to consolidate the cases for trial. Following a jury trial in October 2004, Hamilton was acquitted of one theft charge, and a mistrial was declared because the jury was unable to reach a verdict on the remaining counts.

On December 21, 2004, the State filed amended counts one through six under cause number FD–126, which charged Hamilton with conversion, and count sev-

**7.** Ham was moved to a Medicaid-approved facility in January 2003, where she died ap-    proximately one month later.

en, which charged her with theft. Thereafter, on January 7, 2005, Hamilton's original defense counsel filed a motion to withdraw his appearance, which the trial court subsequently granted.

An initial hearing on the amended charges was held on January 11, 2005, and a jury trial was reset for May 24, 2005. At that hearing, Hamilton informed the trial court that she was without legal representation, but "will be hiring someone else." Tr. p. 7. As a result, the trial court set an omnibus hearing date and ordered Hamilton to appear at that hearing.

Hamilton appeared pro se at the March 16, 2005 omnibus hearing, and the trial court inquired whether she had done anything to prepare for trial. Hamilton responded that she had been interviewing attorneys and that it was still her intention to hire counsel. The trial court then admonished Hamilton, indicating that "you should hire an attorney as soon as possible ... I'm not inclined to grant any continuances." *Id.* at 3.

The day before trial, Hamilton appeared at a hearing with counsel, at which time an oral motion was made for a continuance. Hamilton's counsel apologized to the trial court and stated that Hamilton had retained him one day prior to the hearing—only two days before the trial was to commence. As a result, defense counsel explained that he had not had time to review the evidence or prepare a defense. At this hearing, the trial court again read the amended information in cause number

FD–126 regarding the conversion and theft charges. The trial court also noted that the charges set forth in cause numbers FC–201 and FC–507 would be tried at the same time. Defense counsel expressed surprise that the originally-filed charges-in addition to the amended counts-were also set for trial on the same day. Indeed, defense counsel remarked, "It was my understanding there were [only] six counts of conversion and a theft." *Id.* at 28. At the conclusion of the hearing, the trial court denied Hamilton's motion for continuance. Following the jury trial that commenced on May 24, 2005, Hamilton was found guilty as charged, and was subsequently sentenced on all counts. She now appeals.

## DISCUSSION AND DECISION

### I. Motion for Continuance

██ Hamilton claims that the trial court abused its discretion in denying her motion for a continuance. Specifically, Hamilton maintains that her convictions must be vacated because she did not know that she was going to be prosecuted on the original felony counts until the day before trial.

██ In support of her contention, Hamilton directs us to Indiana Trial Rule 53.5, which provides in part that a "trial may be postponed or continued in the discretion of the court, and shall be allowed upon a showing of good cause established by affidavit or other evidence." When, as here, a motion for a continuance is based on non-statutory grounds or the motion fails to meet the statutory criteria,[8] the

---

8. The statutory criteria referred to above are set forth in Indiana Code Section 35–36–7–1:

   (a) A motion by a defendant to postpone a trial because of the absence of evidence may be made only on affidavit showing:
   (1) that the evidence is material;
   (2) that due diligence has been used to obtain the evidence; and
   (3) the location of the evidence.

   (b) If a defendant's motion to postpone is because of the absence of a witness, the affidavit required under subsection (a) must:
   (1) show the name and address of the witness, if known;
   (2) indicate the probability of procuring the witness's testimony within a reasonable time;

decision to grant or deny the motion is within the discretion of the trial court. *Arhelger v. State,* 714 N.E.2d 659, 667 (Ind.Ct.App.1999). We will not disturb the trial court's decision absent a clear demonstration that the trial court abused that discretion. *Wells v. State,* 848 N.E.2d 1133, 1143 (Ind.Ct.App.2006). An abuse of discretion occurs when the ruling is against the logic and effect of the facts and circumstances before the trial court or when the record demonstrates prejudice resulting from the denial. *Flake v. State,* 767 N.E.2d 1004, 1008 (Ind.Ct.App.2002). Additionally, for a denial of a continuance to constitute reversible error, the defendant must demonstrate that she was prejudiced by the denial. *Macklin v. State,* 701 N.E.2d 1247, 1250 (Ind.Ct.App.1998). The withdrawal of counsel does not entitle a party to an automatic continuance. *Danner v. Danner,* 573 N.E.2d 934, 937 (Ind. Ct.App.1991).

In this case, Hamilton indicated to the trial court at both the January 2005 and March 2005 hearings that she intended to hire counsel. Tr. p. 2, 7. The trial court specifically warned Hamilton at the March 16, 2005, hearing about the consequences of delay in retaining counsel: "I've been through this hundreds of times and what will happen, you're … you will hire an attorney at the last minute, your attorney will come in and ask for a continuance because he's not prepared, and you may have trouble getting any more continuances out of the Court." Tr. p. 3. Hence, Hamilton was aware of her need for counsel and the possible dangers of delay.

The record shows that the State filed a one-count information under one cause number, a three-count information in another, and a seven-count information in yet another cause number that was later amended. Appellant's App. p. 1, 9, 16, 651, 654, 658, 661–67. An initial hearing was held with regard to all three causes, and Hamilton entered a not guilty plea as to each. *Id.* at 2, 10, 17. As noted above, the first trial held in October 2004 resulted in a mistrial, and an initial hearing was held on the amended charges on January 11, 2005. Any failure to mention the two other cause numbers at the January 11 hearing is explained by the fact that the purpose of the hearing was to provide Hamilton with notice of the amended charges. In other words, there was no need to address the other two causes because the initial hearings in those cases had already occurred. Indeed, it is undisputed that all three causes are factually related and were consolidated by the trial court before the first trial. Moreover, it was Hamilton who requested that consoli-

---

(3) show that the absence of the witness has not been procured by the act of the defendant;

(4) state the facts to which the defendant believes the witness will testify, and include a statement that the defendant believes these facts to be true; and

(5) state that the defendant is unable to prove the facts specified in accordance with subdivision (4) through the use of any other witness whose testimony can be as readily procured.

(c) The trial may not be postponed if:

(1) after a motion by the defendant to postpone because of the absence of a witness, the prosecuting attorney admits that the absent witness would testify to the facts as alleged by the defendant in his affidavit in accordance with subsection (b)(4); or

(2) after a motion by the defendant to postpone because of the absence of written or documentary evidence, the prosecuting attorney admits that the written or documentary evidence exists.

(d) A defendant must file an affidavit for a continuance not later than five (5) days before the date set for trial. If a defendant fails to file an affidavit by this time, then he must establish, to the satisfaction of the court, that he is not at fault for failing to file the affidavit at an earlier date.

dation should occur for purposes of a single trial. *Id.* at 4, 10, 17. There is simply no indication in the record that the trial court dismissed any of the charges or that the State no longer intended to pursue them. Put another way, those allegations did not disappear merely because the trial court did not expressly refer to the precise cause numbers at the initial hearing on the amended charges or at the omnibus hearing. Finally, any prejudice that inured to Hamilton was caused by her own delay in hiring counsel. Therefore, we cannot say that the trial court abused its discretion in denying Hamilton's motion for a continuance.

## II. Due Process

In a related issue, Hamilton argues that she was denied the right to due process. Specifically, Hamilton claims that the trial court's failure to provide her with clear notice of the "additional felonies and charges for which she was actually tried" resulted in the denial of due process because there was not adequate time to prepare for trial. Appellant's Br. p. 15. "Although due process has never been precisely defined, the phrase expresses the requirement of 'fundamental fairness.'" *In re M.M.*, 733 N.E.2d 6, 10 (Ind.Ct.App. 2000). This court has held that "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Thompson v. Clark County Div. Of Family & Children*, 791 N.E.2d 792, 795 (Ind. Ct.App.2003). In every criminal case, an accused is entitled to clear notice of the charge or charges against which the State summons him to defend. U.S. Const. Amend. XIV; Ind. Const. Art 1, § 13. Clear notice serves the dual purposes of allowing an accused to prepare his defense and protecting him or her from being placed twice in jeopardy for the same offense. *Wright v. State*, 658 N.E.2d 563, 565 (Ind.1995).

Here, Hamilton cites no authority in support of her contention that the mistrial, the State's subsequent motion to reset the trial, and the trial court's grant of that motion failed to afford her clear notice of the other two causes. To the contrary, Hamilton was given more than adequate notice of the charges. Indeed, the fortuitous occurrence of a mistrial placed Hamilton in the advantageous position of being able to anticipate what evidence might be presented at the second trial. However, her failure to seek replacement counsel and the unwarranted assumption that she no longer faced those charges nullified any advantage that she may otherwise have had. While the trial court could have specifically referred to the charges in all three cause numbers at the omnibus hearing, we cannot agree that such an omission negated Hamilton's notice of the charges and her opportunity to answer those charges. Therefore, Hamilton's due process argument fails.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and CRONE, J., concur.