

# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**ALICE L. BARTANEN BLEVINS**
**ETHAN G. BARTANEN**
Bartanen Law Office, LLC
Salem, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| JOHN AARON SHOULTZ III, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 36A01-1208-CR-359 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE JACKSON CIRCUIT COURT
The Honorable William E. Vance, Judge
Cause No. 36C01-0905-MR-2

**August 21, 2013**

**MEMORANDUM DECISION–FOR PUBLICATION**

**BAKER, Judge**

In this case, appellant-defendant John Aaron Shoultz III's cruelty toward animals to control and manipulate those around him took a more sinister turn on the evening of May 2, 2009. That evening, Shoultz decided to kill his mom's new puppy, which she had received as a gift from Shoultz's dad after Shoultz had slit the throat of his mom's beagle a few weeks before. Shoultz's girlfriend convinced him to duct-tape the dog's legs instead. When Shoultz's father went to confront him, Shoultz shot him several times, killing him.

Shoultz now appeals his convictions for Murder,[1] a felony, and Unlawful Possession of a Firearm by a Serious Violent Felon,[2] a class B felony, raising numerous arguments. More particularly, Shoultz contends that the trial court erred by allowing testimony regarding prior acts of animal cruelty and an earlier conviction for battery with a deadly weapon against his father. Additionally, Shoultz maintains that the trial court erred by refusing to grant his oral request for a continuance to locate a witness. Further, Shoultz alleges that the prosecutor committed misconduct and that the trial court erred by refusing to give his proffered jury instructions. Finally, Shoultz argues that there is insufficient evidence to sustain his conviction for murder in light of inconsistent witness statements and his self-defense claim. Finding no error and sufficient evidence, we affirm the judgment of the trial court.

---

[1] Ind. Code § 35-42-1-1(1).

[2] Ind. Code § 35-47-4-5(c).

FACTS

Andrea Howard and Shoultz[3] began dating around October 2008, and shortly after, they moved in with Shoultz's mother and father, John and Rhonda Shoultz, in Tampico. During the time that Andrea lived with Shoultz, she had a dog named Nightmare, and Shoultz had a dog named Ring. When Andrea first moved in with the Shoultzes, Rhonda had a beagle named Kane. Shoultz had an unusual hatred for small dogs, such as Kane. Indeed, several weeks before the incident that is the subject of this appeal, Shoultz slit Kane's throat inside his parents' home when Rhonda tried to break up an argument between Shoultz and Andrea after Andrea told Shoultz that she wanted to move out. Andrea did not leave Shoultz at that time because she feared him.

Although Shoultz had a vehement hatred for small dogs, this did not stop him from killing larger breeds as well. Before slitting Kane's throat, Shoultz took Andrea out to the barn, gave her a gun, and told her to shoot one of his pit bull dogs that was tied up in the barn and wagging its tail. When Andrea refused to do it, Shoultz took the gun, shot and killed the dog and told Andrea that she had better do what he told her. This incident also caused Andrea to fear Shoultz.

After Shoultz had killed Kane, John moved out for a few weeks, but returned with a puppy for Rhonda which she named Tiny Tot. On the evening of May 2, 2009, Andrea woke up after sleeping all day. After showering, she returned to the bedroom where

---

[3] In the trial transcript, the defendant's family name is spelled "Schultz," but the rest of the record indicates that the correct spelling is "Shoultz." Consequently, we will use the latter spelling.

3

Shoultz began ranting about his mother having another dog and how he hated that dog. Shoultz stated that he wanted to kill Tiny Tot, but Andrea dissuaded him from killing the dog and suggested that instead, they tape the dog's legs together. Shoultz agreed to this.

Andrea and Shoultz snuck into Rhonda's bedroom where she was sleeping with Tiny Tot, took the dog back to their bedroom, duct-taped the dog's legs together, and returned the dog to Rhonda, who was still sleeping. When Rhonda woke up and saw what had happened to Tiny Tot, she began yelling angrily and woke John, who stated that Shoultz and Andrea should not have done that to Tiny Tot.

Rhonda and John attempted to remove the duct tape from Tiny Tot, but their efforts only caused the puppy pain. Andrea overheard John remark that he should do the same thing to her and Shoultz's dogs, so she gathered their dogs and brought them into their bedroom. Andrea did not hear John make any threat against her or Shoultz. When Andrea returned to the bedroom with the dogs, Shoultz was sitting on the bed facing the door, holding a gun in both hands and pointing it towards the door. Andrea closed the door when she returned with the dogs, and Shoultz locked the bedroom door. Shoultz then returned to the bed and pointed the gun at the door.

John turned the door knob, and Shoultz told him to not enter the room, but John opened the door and took several steps into the room, cradling Tiny Tot in his arms. John did not have a weapon and did not say anything. Shoultz then fired four shots approximately one to two seconds apart. John fell to the floor, and Shoultz knelt by his father for a few seconds and told him to not die. Shoultz and Andrea then left their

4

bedroom to look for Rhonda but were unable to find her because she had fled and hid when she heard the gunshots.

Shoultz suggested that they blame the shooting on Rhonda. Shoultz took Rhonda's car keys and cell phone from her purse and left the house with Andrea. Shoultz used Rhonda's cell phone to call his paternal grandmother, Mary Jane Johnson, and told his grandmother that he had just shot his father. Following this cell phone call, Shoultz walked back into his bedroom, stepped over his dying father who was gasping for air, and retrieved his shoes so that he and Andrea could leave the house.

Shoultz hid the gun in the barn, and then he and Andrea drove away in Rhonda's van. Andrea called her mother and told her what had happened, but she did not believe her daughter. Shoultz received a phone call from his grandmother or aunt. Shoultz told the caller that Andrea had shot and killed John. Shoultz also called his aunt, Mona Lisa Black, and told her that Andrea had killed John, shooting him ten times. Black asked Shoultz if he had called 911, to which he responded that he had not because he feared that he would be blamed. A short time later, police officers pulled over the van and took Andrea and Shoultz into custody.

When North Vernon Police Officer Todd Beam conducted a pat-down search of Shoultz, he recovered several knives and a latex glove containing several bullets. Jackson County Deputy Sheriff Jeff Walters advised Shoultz of his rights and then Shoultz blurted out that his mother and father had been arguing and that his mother shot his father.

5

Shoultz and Andrea were separated, and at first, Andrea told the police that she threw the gun under a pile of wood and that she had shot John. However, Andrea later conveyed to the officers that Shoultz had shot his father.

Amy Burrows-Beckham, M.D., an assistant medical examiner in Kentucky, performed an autopsy on John. Her examination revealed that John had sustained three bullet wounds, one that entered his abdomen and two that entered the right side of his chest. John had also sustained a bullet wound to his right hand that likely went through his hand and into his abdomen. John further suffered a serious wound to his left foot that was ulcerated, infected, and down to the bone. This wound would have caused John serious pain, forcing him to walk with a significant limp. Tiny Tot did not escape the attack unscathed; he was struck with a bullet in the leg while John was holding him.

The gunshot wound to John's abdomen would not have caused death had he received medical treatment; however, the gunshot wounds to the chest would have been fatal in any event. Thus, John's cause of death was from two gunshot wounds to his chest, and the manner of death was homicide.

On May 6, 2009, the State charged Shoultz with Count I, murder, a felony; and Count II, unlawful possession of a firearm by a serious violent felon, a class B felony. On May 29, 2012, Shoultz filed a self-defense claim.

While in jail, Shoultz had a recorded telephone conversation with his mother, Rhonda. During the conversation, Shoultz blamed Rhonda for having Tiny Tot in the house. He told his mother that he had planned to kill Tiny Tot that night but that Andrea

6

had talked him into duct-taping the puppy instead. Shoultz also told his mother that he needed Andrea to cooperate and that when he was out of jail, he would kill the new little dog that she had, even if it meant going back to jail, because "I don't give a f***. I don't like little dogs." Tr. p. 229.

Shoultz's jury trial commenced on June 4, 2012. Andrea testified for the State, describing in detail the events surrounding Shoultz slitting Kane's throat, shooting his own pit bull, and shooting his father. Following the presentation of the State's case-in-chief, Shoultz verbally requested a continuance because he wanted to call Andrea as a defense witness but was unable to find her at that time. The trial court denied Shoultz's request, concluding that the issues that Shoultz wished to question Andrea about had already been covered by her earlier testimony. The trial court also determined that it was not convinced that Andrea has been properly served with a subpoena because the defense had served Andrea's attorney in another case, and Andrea was not a party to the present case.

Likewise, the trial court refused to give Shoultz's self-defense instructions, but instead, gave its own. On June 8, 2012, the jury found Shoultz guilty on both counts. On July 16, 2012, the trial court sentenced Shoultz to fifty-eight years on the murder conviction and to a concurrent term of fifteen years on the SVF conviction, for a total aggregate sentence of fifty-eight years imprisonment. Shoultz now appeals.

## DISCUSSION AND DECISION

### I. Evidence Rule 404(b): Other Crimes, Wrongs, and Acts

Shoultz argues that the trial court erred by permitting testimony regarding his acts of animal cruelty. Additionally, Shoultz contends that the trial court erred by allowing testimony concerning prior violent acts that Shoultz had committed against his father in 2006.

Whether to admit or exclude evidence is within the sound discretion of the trial court. Hardiman v. State, 726 N.E.2d 1201, 1203 (Ind. 2000). We will reverse the trial court's decisions regarding the admission or exclusion of evidence when it has been demonstrated that the trial court abused its discretion, which occurs when the trial court's evidentiary ruling is clearly against the logic and effect of the facts and circumstances before it. Id.

### A. Waiver

As an initial matter, the State argues that Shoultz has waived any claim that the trial court erred in admitting evidence of Shoultz's prior bad acts of animal cruelty because he failed to raise objections to this evidence when it was introduced at trial. The failure to make a contemporaneous objection to evidence when it is offered waives any claim of error in its admission on appeal. Bean v. State, 913 N.E.2d 243, 253 (Ind. Ct. App. 2009). The reasoning behind this rule, in part, is to immediately and fully alert the trial court of the legal issue. Id.

Shoultz challenges the admission of evidence pertaining to acts of cruelty inflicted upon Kane and his own pit bull. Regarding Kane, Andrea testified that when Kane followed Rhonda to break up an argument between Shoultz and Andrea, Shoultz told his mother to "get that f***ing dog out of his room." Tr. p. 49. Shoultz then stabbed Kane "around its stomach," after which Kane ran away "bleeding and yelping." Id. at 49-50. Shoultz then followed the dog, grabbed him "by the scruff of his neck and slit his throat." Id. at 50-51.

Not once during this emotionally-charged testimony did Shoultz lodge an objection. Instead, Shoultz relies on a motion in limine filed before trial. However, "[a]s a general rule, motions in limine do not preserve errors for appeal; the defendant must reassert his objection at trial contemporaneously with the introduction of the evidence." White v. State, 687 N.E.2d 178, 179 (Ind. 1997). Consequently, Shoultz has waived this claim as it pertains to Kane, his mother's beagle.

Waiver notwithstanding, Andrea's testimony reveals the intense conflict in the home and is further evidence of Shoultz's admitted hatred of small dogs. This was followed a few weeks later by the torturing of Rhonda's new Chihuahua puppy, another small breed dog, and the murder of his father. This certainly is relevant to motive and intent, particularly in light of the fact that Shoultz had asserted self-defense. See Goldsberry v. State, 821 N.E.2d 447, 456 (Ind. Ct. App. 2005) (concluding that evidence of prior altercations were admissible when the defendant had alleged self-defense,

9

placing his intent into issue, and frequent conflicts between the parties was relevant to show motive).

Moving forward to Shoultz's pit bull, during direct examination Andrea was asked why she was so afraid of Shoultz such that she had initially taken the blame for John's murder. Andrea responded that Shoultz had taken her out to the barn where he had one of his pit bulls chained and told her to shoot the dog. Andrea testified that the dog was "[w]agging her tail" and that she "couldn't do it." Tr. p. 134. Shoultz took the gun and shot the dog. Shoultz instructed Andrea that she needed to stand by him, and she stated that she was afraid of him after that. Id.

While no objection was made during Andrea's testimony, just prior to this testimony, there was a brief recess during which the prosecutor brought to the attention of the trial court an earlier "affirmative motion in limine" requesting that the State be permitted to introduce testimony regarding the pit bull incident. Tr. p. 125. The prosecutor requested that the trial court reconsider its previous denial of that motion in light of questions that Andrea had been asked on cross-examination regarding her fear of Shoultz. Both the prosecutor and defense counsel intensely expressed their positions regarding the request. In light of the fact that the trial court was fully alerted as to the precise legal issue, the purpose behind the contemporaneous objection rule has been satisfied. Accordingly, these circumstances present a rare exception to that rule, and Shoultz has not waived this issue on appeal.

B. The Pit Bull

Shoultz maintains that the trial court erred by allowing testimony concerning cruelty that he displayed towards his pit bull. Rule 404(b) provides that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

"The list of other purposes is illustrative not exhaustive." Hicks v. State, 690 N.E.2d 215, 219 (Ind. 1997).

In Hicks, our Supreme Court established the standard for assessing the admissibility of 404(b) evidence:[4] (1) the court must determine whether the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect under Evidence Rule 403. Id. at 221.

Here, as stated above, the prosecutor argued that Andrea should be permitted to testify regarding the pit bull incident because the defense had put Andrea's fear of Shoultz into issue. More particularly, the prosecutor stated:

> I think that is relevant because the defense asked the following questions, um, said once they were separated into different squad cars did she still continue to tell the same story, did she still continue to, uh, to back the story that John Aaron Schultz had brought up to the police and she said that

---

[4] Although Shoultz suggests that the proper standard for assessing 404(b) claims is the one applied by the United States Court of Appeals for the Seventh Circuit, appellant's br. p. 16, our Supreme Court has explicitly stated "We see no persuasive reason to adopt the Seventh Circuit test." Hicks, 690 N.E.2d at 219. Accordingly, we will analyze Shoultz's claims pursuant to the standard established by our Supreme Court.

11

she did  Um, that she did even after they were separated and then asked her did my client ever threaten you to which, you know, on that day, to which she said no, but at that point I believe that it becomes relevant when she's been threatened in the past . . . .

Tr. p. 126.  And when the trial court granted the prosecutor's request, it stated,

I do believe that once this witness is questioned concerning whether or not she was threatened by the defendant that, uh, uh, that has to speak to whether or not the witness has a reasonable fear and other evidence then to, that's <u>she's been impeached</u>, if you will, on that and I believe that's, that evidence is relevant to, uh, deal with that.

<u>Id.</u> at 130 (emphasis added).

It is evident from the prosecutor's argument and the trial court's rationale for permitting the testimony that the evidence was relevant to a matter other than Shoultz's propensity to commit murder, namely, to rehabilitate Andrea after her fear of Shoultz had been placed into question by the defense on cross-examination.  Accordingly, the testimony survives the first prong of the <u>Hicks</u> test.

As for the second prong, under Rule 403, relevant evidence may be excluded "if its probative value is <u>substantially outweighed</u> by the danger of unfair prejudice . . . ." (Emphasis added).  Here, Andrea had already testified that Shoultz had slit Kane's throat and that she had convinced him to duct-tape Tiny Tot's legs instead of killing him, which is what Shoultz had wanted to do.  Tr. p. 51, 58.  In light of fact that the jury had already heard testimony regarding those two instances of animal cruelty and that Andrea's fear of Shoultz had been brought into issue by the defense, we cannot say that the probative value of Andrea's testimony regarding the pit bull incident was substantially outweighed

12

by the danger of unfair prejudice. Thus, her testimony survives the second prong of the Hicks test, and the trial court did not err by permitting it.

C. Prior Violent Acts Against John

Shoultz argues that the trial court erred by allowing testimony regarding prior violent acts that Shoultz had committed against his father. Although Shoultz concedes that his conviction for battery with a deadly weapon is relevant for purposes of the jury to determine whether he was a serious violent felon as charged in Count II, he argues that a record of his conviction would have sufficed to prove this rather than a long line of questioning by the prosecution that elicited details of the event.

Here, Rhonda testified that Shoultz "did cut his dad at one point, yes" and that she had to take her husband to the hospital as a result of the injuries he sustained in that attack. Tr. p. 221-22. Rhonda stated that Shoultz pleaded guilty and was convicted of battery with a deadly weapon. Id. at 222. Shoultz did not object to any of this testimony.

After Rhonda gave this testimony, the prosecutor and the defense counsel had a conference with the trial judge regarding the same incident. The prosecutor wanted to tell the entire story including that Shoultz had shot his dad's dog for urinating on the floor, which is what had precipitated the fight. Tr. p. 357. Defense counsel objected to any further details, arguing that they were too remote, occurring almost three years before John was murdered. Ultimately, the trial court decided to not allow these additional details, noting that there had been sufficient acts of animal cruelty brought to the attention of the jury during the course of the trial.

13

Although the trial court ruled in Shoultz's favor on this evidentiary issue, he complains that Deputy Sheriff Adam Nicholson testified that Shoultz had told him that "he took an action that he reasonably knew would anger his father[.]" Tr. p. 416. Shoultz further argues that this question was used during closing argument to assert that his prior act resulted in John being stabbed in the face with a knife. Appellant's Br. p. 17.

Errors in the admission of evidence are generally to be disregarded unless they affect the defendant's substantial rights. Hoglund v. State, 962 N.E.2d 1230, 1238 (Ind. 2012), reh'g denied. Here, the evidence presented through Deputy Sheriff Nicholson's testimony was merely cumulative of the testimony given by Shoultz's mother, Rhonda.

Moreover, as discussed above, the altercation between John and Shoultz was probative to the level of hostility between them. And it is difficult to maintain that the probative value is substantially outweighed by the danger of unfair prejudice in that it is tenuous indeed to assume that the jury made a connection between the "action that [Shoultz] reasonably knew would anger his father," appellant's br. p. 17, and another instance of animal abuse. Therefore, the evidence did not run afoul of Rule 404(b).

## II. In-Trial Request for a Continuance

Shoultz next contends that the trial court erred by failing to grant his motion to continue so that Shoultz could obtain the presence of a witness. More particularly, Shoultz wanted the court to adjourn for the day so that he could locate Andrea and present her as a witness.

Because Shoultz's oral motion for a continuance made during the middle of his jury trial did not comply with the statutory requirements of Indiana Code section 35-36-7-1, which specifies the requirements necessary to postpone a trial because of the absence of evidence, his continuance motion is non-statutory. As a result, a trial court's rulings on such motions are within its sound discretion. Hamilton v. State, 864 N.E.2d 1104, 1108-09 (Ind. Ct. App. 2007).

On appeal, we will review a trial court's denial of a non-statutory continuance motion only for an abuse of discretion and resultant prejudice. Barber v. State, 911 N.E.2d 641, 645-46 (Ind. Ct. App. 2009). An abuse of discretion occurs only where the trial court's decision is clearly against the logic and effect of the fact and circumstances before the court. Washington v. State, 902 N.E.2d 280, 286 (Ind. Ct. App. 2009). Additionally, the appellant must demonstrate that he was prejudiced by the denial. Hamilton, 864 N.E.2d at 1109. `

Here, Shoultz asserts that he "believes that there was additional information that was crucial to his defense that would have been covered during this examination and that he should have been provided an opportunity to present said information." Appellant's Br. p. 20. Shoultz does not elaborate on the nature of the information that would have been elicited during his direct examination of Andrea or how it was crucial to his defense. Thus, Shoultz has failed to establish prejudice.

Moreover, Shoultz did not try to personally serve Andrea with the subpoena, but rather, faxed it to an attorney who was representing her in another case. Indiana Trial

15

Rule 4.1 provides that "[s]ervice may be made upon an individual, or an individual acting in a representative capacity" by registered or certified mail, personally delivering a copy of the subpoena, leaving a copy at her house, or serving his agent. See also Ind. Trial Rule 45(C) (providing that service of subpoenas may be made in accordance with Trial Rule 4). Here, the attorney to whom the subpoena was faxed was not acting as Andrea's representative in the instant matter. Additionally, the subpoena was not sent via certified or registered mail or personal delivery. Consequently, we agree with the trial court that, under these circumstances, Shoultz did not have a subpoena served on Andrea. Accordingly, the trial court did not err by denying Shoultz's motion for a continuance.

### III. Prosecutorial Misconduct

Shoultz asserts several instances of prosecutorial misconduct, including:

- Referencing the killing of animals as "murder."
- Informing the jury about the large amount of State resources spent on Shoultz's trial.
- Playing a recorded jailhouse telephone conversation between Shoultz and Rhonda where Shoultz states: "I'll come back to jail, I don't give a f***. I don't like little dogs." Tr. p. 541.

Shoultz alleges that he did not waive these claims by failing to object and requesting a mistrial because these instances of misconduct rose to the level of fundamental error.

Generally, to preserve a claim of prosecutorial misconduct, a defendant must request an admonishment or a mistrial if an admonishment is inadequate. Castillo v. State, 974 N.E.2d 458, 468 (Ind. 2012). Failure to follow these steps results in waiver. Id.

16

Nevertheless, an appellant can attempt to avoid waiver by invoking the fundamental waiver doctrine. Id. The fundamental error doctrine is extremely narrow. Mathews v. State, 849 N.E.2d 578, 587 (Ind. 2006). To be sure, it "applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." McQueen v. State, 862 N.E.2d 1237, 1241 (Ind. Ct. App. 2007).

As for the prosecutor describing as "murder" the two instances that Shoultz brutally killed two helpless dogs, although that word is a legal term of art, Shoultz fails to show error let alone grave peril. The reason is simple: We can rest assured that a jury of Shoultz's peers will not become entangled in a legal term of art. Instead, there is nothing to indicate that the citizens of this State did not use common sense to understand that the prosecutor's use of the term "murder" referenced Shoultz's senseless killing of two dogs who were not showing the slightest bit of aggression.

Moving on to the prosecutor's statements that the State had expended vast amounts of resources in trying to bring Shoultz to justice, Shoultz has taken this statement out of context. In an attempt to rebut a statement that the State had presumed that this case was simply "trash killing trash," tr. p. 546, the prosecutor wanted to assure the jury that the case was adequately investigated. Specifically, the prosecutor stated

> the defendant did a significant amount of forensic testing and spent a huge amount of the state's resources to make sure that witness testimony and evidence gathered in this case were, in fact, backed up by scientific evidence in this case so that the case was fully investigated and so that you, the jury, would ultimately be comfortable about it.

17

Tr. p. 546.

It is apparent from the above statements that the prosecutor wanted to alleviate any concerns that the jury might have harbored regarding the quality of the investigation in light of the social status of the victim and the alleged perpetrator. This is not impermissible, and indeed, we want the citizens of this State to be informed that crimes are investigated with vigor regardless of social status. Consequently, there was no error.

Shoultz's final claim of prosecutorial misconduct involves the telephone conversation between him and Rhonda that was recorded while he was in jail and played for the jury during closing argument. More particularly, Shoultz claims that the prosecutor deliberately misstated that Shoultz had said to Rhonda, "I'll come back and kill 'em," when what he actually said was "I'll come back to jail." Tr. p. 541, 557. In any event, the prosecutor explained to the jurors that it was up to them to decide what Shoultz had said and that either version had the same effect, namely, that Shoultz did not care about the consequences of his actions. Id. at 605. Under these circumstances, we cannot say that the prosecutor committed misconduct.

## IV. Jury Instructions

Shoultz asserts that the trial court erred by denying his proffered jury instructions on self-defense. The State claims that Shoultz has waived this issue because he failed "to set out in the argument section of his appellant's brief the verbatim jury instructions and

18

the verbatim objections at trial regarding the relevant jury instructions." Appellee's Br. p. 21.

Appellate Rule 46(A)(8)(e) provides that "[w]hen error is predicated on the giving or refusing of any instruction, the instruction shall be set out verbatim in the argument section of the brief with the verbatim objections, if any made thereto." Shoultz concedes that he failed to set out the instructions or the objections verbatim in the argument section of his brief. Nevertheless, Shoultz points out that his proposed jury instructions and the final jury instructions have been included in the Appellant's Appendix to which he cites. Additionally, Shoultz highlights the fact that he cited to portions of the record where the relevant objections were made. Therefore, according to Shoultz, he has followed the "spirit" of the Rule 46(A). Reply Br. p. 10.

While we encourage practitioners and others appearing before this Court to follow the precise instructions of the Appellate Rules rather than simply the "spirit" of the Rules, we also prefer to decide cases and issues on the merits. But even more applicable to the instant case, Shoultz has impeccably cited to the appendix and transcript, thereby permitting this Court to easily evaluate his claim. Therefore, Shoultz has not waived this claim.

Proceeding to the merits, when determining whether the trial court erred in refusing the defendant's tendered instruction, this Court will look to whether: (1) the tendered instruction correctly states the law; (2) there is evidence in the record to support

the giving of the instruction; and (3) the substance of the tendered instruction is covered by other instructions. Sylvester v. State, 698 N.E.2d 1126, 1131 (Ind. 1998).

Here, the trial court gave the jury the following instruction on self-defense:

It is an issue whether the Defendant acted in self-defense. A person may use reasonable force against another person to protect himself from what he reasonably believes to be the imminent use of unlawful force. A person is justified in using deadly force, and does not have a duty to retreat, only if he reasonably believes that deadly force is necessary to prevent serious bodily injury to himself. However, a person may not use force if: He is committing a crime that is directly and immediately connected to the confrontation giving rise to the self-defense claim or he provokes a fight with another person with intent to cause bodily injury to that person. The State has the burden of proving beyond a reasonable doubt that the Defendant did not act in self-defense.

Appellant's App. p. 13.

This instruction comports with statutory law, inasmuch as it tracks Indiana Code section 35-41-3-2 (Self-Defense Statute). Moreover, it comports with applicable caselaw. In Mayes v. State, our Supreme Court concluded that although a defendant may be committing a crime at the time he is allegedly defending himself, this is not sufficient to deprive the defendant of a self-defense instruction. 744 N.E.2d 390, 394 (Ind. 2001). Instead, "there must be an immediate causal connection between the crime and the confrontation." Id. In other words, if the defendant had not committed the crime, the confrontation with the victim and the resulting injury would not have occurred. Id.

By contrast, Shoultz's tendered instructions did not mention the "committing a crime" provision. Appellant's App. p. 11-12. Accordingly, they were not correct

20

statements of the law applicable to this case, and the trial court did not err by refusing to give them.

## V. Sufficiency of the Evidence

Finally, Shoultz argues that the evidence was insufficient to sustain his conviction for murder. When reviewing a challenge to the sufficiency of the evidence, this Court neither reweighs the evidence nor judges the credibility of witnesses. Treadway v. State, 924 N.E.2d 621, 639 (Ind. 2010). Instead, we will consider only the probative evidence and the reasonable inferences supporting the trial court's verdict. Id.

Additionally, when a defendant claims self-defense and there is evidence in the record that provides support for that claim, the State, has the burden to negate at least one of the necessary elements of the self-defense claim beyond a reasonable doubt. Bryant v. State, 984 N.E.2d 240, 250 (Ind. Ct. App. 2013). On appeal, the standard of review when self-defense is claimed is the same as the sufficiency standard. Randolph v. State, 755 N.E.2d 572, 576 (Ind. 2001).

Shoultz makes two arguments, namely, that Andrea gave inconsistent statements, and the evidence indicated that Shoultz acted in self-defense. The first is easily disposed of because, as stated above, we do not judge the credibility of witnesses. Treadway, 924 N.E.2d at 639.

As for Shoultz's claim of self-defense, to succeed on this claim, a defendant must present evidence that he: (1) was in a place that he had a right to be in; (2) did not

21

provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm. Bryant, 984 N.E.2d at 250.

In this case, Andrea testified that Shoultz wanted to kill his mother's new puppy but that she talked him into duct-taping its legs together instead to distract him and that the two of them carried out this plan together. Tr. p. 57-61. This occurred in the context of Shoultz having slit the throat of his mother's beagle, and he knew how this incident had upset his father. Id. at 48-54. Furthermore, Shoultz's father had purchased the new puppy for his mother after Shoultz had slit the beagle's throat. Id. at 54-55.

From these facts, the factfinder could reasonably infer that Shoultz wanted to do something terrible to the puppy to upset his parents, which he did. Then, knowing that his father would confront him about the mistreatment of the puppy, Shoultz armed himself and waited to ambush his unarmed father. Id. at 65-77. When John opened the door and stepped into Shoultz's room, he fired four shots at John, killing him. Id. at 74-79. This evidence demonstrates that Shoultz instigated the violence that led to him killing his father.

Nevertheless, Shoultz argues that a "simple practical joke on a Chihuahua could not have been foreseen to escalate to the point which it did." Reply Br. p. 11. Then Shoultz asserts "[a] reasonable and expected response to such a prank would not have involved the use of a deadly weapon and a violent entry into the Appellant's room." Id.

This argument is nothing short of absurd. It was Shoultz who used a deadly weapon to kill his own father. Furthermore, to characterize duct-taping a helpless

22

animal's legs as a "practical joke" or a "prank" diminishes the seriousness of Shoultz's actions and is anything but humorous and perhaps a criminal offense. See Ind. Code § 35-46-3-12(c) (providing that a person who intentionally tortures a vertebrate animal commits a class D felony). In any event, this argument fails.

## CONCLUSION

The trial court did not err by allowing evidence concerning Shoultz's prior acts of animal cruelty and earlier conviction for battery with a deadly weapon against his father. Additionally, the trial court did not err when it denied Shoultz's oral request for a continuance, insofar as Shoultz made no effort to personally serve the witness with a subpoena and failed to show prejudice from the denial of the continuance. Further, Shoultz has failed to demonstrate prosecutorial misconduct, and the trial court properly refused his proffered jury instructions because they were not correct statements of the law applicable to this case. Finally, the State presented sufficient evidence to sustain Shoultz's murder conviction and to negate his claim of self-defense, inasmuch as he instigated the confrontation with his father.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and VAIDIK, J., concur.