**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

**FILED**

Dec 18 2014, 8:05 am

Kevin S. Smith

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**STANLEY L. CAMPBELL**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**CHANDRA K. HEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| TIMOTHY L. HALL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 02A05-1404-CR-183 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Frances C. Gull, Judge
Cause No. 02D05-1308-FB-153

**December 18, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**CRONE, Judge**

## Case Summary

Timothy L. Hall appeals his convictions for class B and class C felony sexual misconduct with a minor. He maintains that the trial court abused its discretion in admitting evidence of prior sexual misconduct with his daughter. He also contends that the evidence is insufficient to support his convictions. Finding that the trial court acted within its discretion in admitting the challenged evidence and finding the evidence sufficient to support his convictions, we affirm.

## Facts and Procedural History

The facts most favorable to the verdict are as follows. In 2012, the forty-two-year-old Hall lived with his fifteen-year-old daughter B.B. On Saturday, December 1, 2012, B.B. phoned her childhood friend K.F., also age fifteen, and invited her to spend the night. Hall and B.B. picked up K.F., and the three ate dinner with Hall's mother and brothers. Afterwards, they went to Hall's house. Hall drank beer, and the girls snuck occasional sips. At one point, K.F. recalled that either Hall or B.B. "said something about a threesome, but I didn't say anything, I kind of laughed it off." Tr. at 42. Because B.B. had a small bed in her room, it was decided that the girls would sleep in Hall's bedroom and he would sleep in the living room.

While K.F. was sleeping, Hall entered the bedroom, crawled into the bed, and kissed her. He attempted to pull down K.F.'s pajama pants, and when she resisted, he told her to "go with it." *Id*. at 48. He climbed on top of her and pinned her arms over her head with one hand. He removed her sweatshirt and pulled down her underwear. He fondled her breasts

2

with his other hand, and when she struggled to get him off of her, he used his legs to immobilize her legs. He inserted his penis into her vagina and engaged in intercourse until he ejaculated. Immediately thereafter, he got up, turned on the light, saw that both K.F. and the sheets were covered with blood, and suggested that she should shower. When she went to take a shower, she observed Hall flushing a condom down the toilet.

After her shower, K.F. went to B.B.'s room and went to sleep in the small bed. Just before dawn, she was awakened by a noise outside the bedroom window. Hall entered the room and inquired about the noise. He took K.F. back to his room, where he pulled down her pants and inserted first his finger and then his penis into her vagina. During the second incident, Hall did not wear a condom and K.F. could not recall him ejaculating. B.B. later testified that she had seen Hall engaging in sexual intercourse with K.F.

Shortly after the second incident, K.F. asked Hall to take her home. On Monday, December 3, 2012, K.F. disclosed the molestation to a teacher at her school. The school's resource officer contacted police, and Fort Wayne Police Detective Todd Battershell took K.F. and her mother to a local sexual assault treatment center. Certified Forensic Nurse Angela Mellon examined K.F. and found an abrasion on her hymen indicating blunt-force trauma consistent with penile penetration as well as a bruise on her wrist.

On August 29, 2013, the State charged Hall with class B felony sexual misconduct with a minor, class C felony sexual misconduct with a minor, and class A misdemeanor contributing to the delinquency of a minor. A jury found Hall guilty of both counts of sexual

3

misconduct with a minor and not guilty of contributing to the delinquency of a minor. Hall now appeals. Additional facts will be provided as necessary.

**Discussion and Decision**

**Section 1 – Admission of Evidence**

Hall challenges the trial court's admission of evidence concerning his alleged sexual misconduct with his daughter B.B. The admission or exclusion of evidence is entrusted to the discretion of the trial court, and we therefore review the trial court's decision for an abuse of discretion. *Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it or it misinterprets the law. *Id.* In conducting our review, we consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. *Id.*

Hall asserts that the admission of evidence violated Indiana Evidence Rule 404(b), which reads in pertinent part,

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character …. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must … provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial … and … do so before trial.

Our supreme court has held that Rule 404(b)'s list of other purposes for which the evidence is admissible is an illustrative rather than an exhaustive list. *Hicks v. State*, 690 N.E.2d 215, 219 (Ind. 1997). Rehabilitation of a witness on redirect has been held to be a

4

proper purpose when the defense has opened the door during cross-examination concerning the witness's credibility based on her fear of the defendant. *Shoultz v. State*, 995 N.E.2d 647, 656 (Ind. Ct. App. 2013), *trans. denied*.

When assessing the admissibility of Rule 404(b) evidence, the trial court must first determine whether the evidence is relevant to a matter at issue other than the defendant's propensity to commit the charged act and then balance the probative value of the evidence against its prejudicial effect under Indiana Evidence Rule 403. *Hicks*, 690 N.E.2d at 219. Rule 403 reads in part that the trial court "may exclude relevant evidence if its probative value is substantially outweighed by the danger of … unfair prejudice."

Here, the State provided the required pretrial notice of its intent to use Rule 404(b) evidence. In that notice, the State alleged that evidence of an ongoing sexual relationship between Hall and his daughter B.B. "is relevant and material and is offered to explain why [B.B.] has given different accounts of the events giving rise to the charges in this cause, the nature of the relationship between the defendant and [B.B.], and [B.B.'s] state of mind." Appellant's Amended App. at 24. Following a hearing, the trial court ruled that the evidence was admissible, finding it "relevant and material" and emphasizing that "its probative value is not far outweighed by its prejudicial impact." *Id*. at 13.

At trial, the State began its brief direct examination of B.B. by asking background questions concerning B.B. and Hall's living situation, how B.B. knew K.F., and how B.B. came to ask K.F. to spend the night. The questions addressing the sexual activity that B.B. witnessed between Hall and K.F. comprise a half-page of transcript:

5

Q      Okay. [B.B.], did there come a time when you became aware that your father had sexual intercourse with [K.F.]?

A      Excuse me? Could you say that again?

Q      Yes. Did there come a time that night when you became aware that your father had had sexual intercourse with [K.F.]?

A      Yes.

Q      And how did you become aware of that? How did you know that happened?

A      I was there.

Q      Okay. When you say you were there, where were you?

A      I was in my father's room.

Q      Okay. And so while he was having sex with [K.F.], did you see that with your own eyes?

A      Yes.

Tr. at 101. The State then concluded its direct examination by asking B.B. her father's age.

During the ensuing cross-examination, defense counsel began by questioning B.B. about how many sips of beer she and K.F. had taken and about whether B.B. was on her menstrual period. Counsel then sought to impeach B.B.'s credibility as follows:

Q      Did you tell the detective that nothing sexual took place?

A      Yes.

Q      And that was between your dad and [K.F.]?

A      Yes.

Q      And your dad wasn't there at the time, was he?

6

A     No.

Q     So he wasn't watching you – over you or trying to – or you weren't under duress, were you?

A     No.

Q     Did you also tell the detective that your dad slept on the couch while you and [K.F.] slept in his bed?

A     Yes.

Q     And since this investigation or since that interview, you've also written letters to your dad; is that correct?

A     Yes.

Q     And you indicate in those letters that he was – didn't do this –

A     Yes.

Q     – is that correct?

A     Yes.

Q     And he wasn't with you or near you when you wrote these letters?

A     He was in jail.

Q     So you weren't around him at that time?

A     No.

Q     And did you also tell others that your dad didn't do this by posting on social media, such as Facebook?

A     Yes.

Q     And in fact, you stated that [K.F.] was interested in your dad, but he turned her down?

A     Yes.

7

Q       And you posted that on Facebook?

A       Yes.

*Id*. at 106-08.

On redirect, the State sought to rehabilitate B.B. as follows:

Q       All right, [B.B.], you – you're in a little bit of a tough spot today, would you agree with me?

A       Yeah.

Q       Okay. That's your dad sitting over there?

A       Yes.

Q       Okay. Growing up, were there substantial periods of time when you lived with your dad?

A       Yes.

Q       Okay. [B.B.], I want to talk a little bit about some things associated with this case and then I want to talk about a couple of different things that you've said since this case has been pending; okay?

A       Um-hmm. (Affirmative response)

Q       And then talk a little bit about the reasons for that. Immediately after this happened, you were interviewed by Detective Battershell; right?

A       Yes.

Q       You said you were there that night, [K.F.] was there that night, nothing sexual happened between her and your dad?

A       Yes.

Q       Was that the truth?

A       No.

8

Q    Okay.  So as time went on, you told a second story about what happened that night, as well; is that correct?

A    Yes.

Q    And [defense counsel's] been asking you about that.  The second story was basically there was blood on the bed because you and [K.F.] had engaged in sexual activity; is that correct?  Is that kind of the second version of what happened that night that you gave?

A    Yeah.

Q    Okay.  Was that true?

A    No.

Q    Okay.  And then the third account that you've given of what happened that night was what you told the jury here today, that you were there and that you're aware that sexual activity occurred between [K.F.] and your father; correct?

A    Yes.

Q    Okay.  Is that accurate?

A    Yes.

Q    Okay.  Between the first account, that nothing happened, and the second account, that you and [K.F.] engaged in sexual activity, did you receive a letter from your father?

A    Excuse me?

Q    Did you receive a letter from your father?

A    Yes.

Q    All right, [B.B.], I'm gonna show what's been marked for identification purposes as State's Exhibit 6; do you recognize this document?

A    Yes.

Q       What is this?

A       A letter from my father.

Q       Is this letter for you?

A       Yes.

Q       To you?

A       Yes.

….

Q       Is this, the portion that you just read, the Defendant basically telling you what to say?

A       Yes.

Q       Okay.  In other words, he's saying, "You need to give a statement that you and [K.F.] engaged in sexual activity and, therefore, there's blood on the sheets"; right?

A       Yes.

Q       It's him telling you to get in touch with [defense counsel] and tell him that; correct?

A       Yes.

Q       Or me or Detective Battershell or somebody; correct?

A       Yes.

Q       Between that statement and when you finally told the truth and gave a statement to Detective Battershell and then testified in court here today, you have made a disclosure yourself; is that correct?

A       I don't understand what you said.

[Defense counsel objects on the basis of Rule 404(b), and a sidebar ensues.]

THE COURT: Okay. I'll overrule it, show a continuing objection, and further note you brought it up, you opened the door. The State didn't open the door in their direct; however, you did, so I'll let it in.

[Defense counsel requests a limiting instruction.]

THE COURT: Ladies and gentlemen, I'll instruct you as members of the jury that the statement that this young lady's going to be giving is to show why she's given different accounts as to what has happened.…

Q    [B.B.], you have disclosed … that your father had been molesting you since you were seven (7) or eight (8) years old; is that correct?

A    Yes.

Q    Okay. And you've disclosed that he has had sexual intercourse with you and engaged in sexual activity with you on a regular basis since you were very young; is that correct?

A    Yes.

Q    Okay. As a result of that, has he developed some level of control over you up to the point where you disclosed that that stuff had been going on?

A    Yeah.

Q    And does that factor in to why you didn't tell the truth about what had happened with [K.F.] until very late in this case?

A    Yes.

Q    Okay. And, [B.B.], the Defendant has now been charged, in addition to this case, with a case alleging that he's molested you for years and years; is that correct?

A    Yes.

*Id.* at 108-15.

We agree with the trial court that Hall opened the door to the evidence to which he now objects. The only account to come out during the State's relatively brief direct examination of B.B. was her most recent account that she saw Hall engaging in sexual intercourse with K.F. During cross-examination, the defense directly addressed B.B.'s first prior inconsistent statement that nothing sexual had occurred between K.F. and Hall. Counsel's questions concerning B.B.'s menstrual cycle, as well as his attempt to clarify that when B.B. said that nothing sexual happened she meant *nothing between Hall and K.F.*, were sufficient to open the door to the State's line of questioning concerning her second false account: that she and K.F. had engaged in sexual conduct which caused K.F. to bleed in the bed. Notably, B.B. gave this second false account at the behest of Hall. Additionally, defense counsel's questions concerning whether Hall was present or watching B.B. when she gave her first false statement to the detective and his follow-up question concerning duress were sufficient to open the door to the State's line of questioning concerning Hall's control over her. Hall's letter (subsequently admitted without objection) is highly probative on the issue of control. It not only contains Hall's instructions for B.B. to lie, but it also indicates an unusual level of control that transcends an ordinary father-daughter relationship. In other words, the letter's tone invites a desperate, fearful response rather than a loving, obedient one. The unredacted portions of the letter paint a portrait more reminiscent of an obsessive lover than a concerned father.

Simply put, the challenged evidence concerning Hall's sexual relationship with his daughter was both relevant and highly probative of why she would twice give false

12

statements to police. The State gave notice of its intent to introduce the evidence if needed and obtained a favorable pretrial ruling. Notwithstanding, the State did not offer the evidence during direct examination and instead simply chose to question B.B. based on her most recent account of the events. Knowing that the State would seek to introduce the evidence if necessary to explain B.B.'s prior inconsistent statements and to emphasize the unusual level of control that Hall had over her, the defense nevertheless opened the door to the evidence by impeaching her based on her inconsistent accounts. It was not until redirect examination that the State elicited the challenged testimony in an effort to rehabilitate its witness and to explain the external influences behind her inconsistent accounts.

As for the danger of unfair prejudice, we acknowledge Hall's claim that while he opened the door concerning B.B.'s inconsistent accounts, the door should not have been so widely flung as to include his sexual history with her. Nevertheless, what seems at first glance a giant leap is not so great a step: (1) B.B. lied twice to police, the second time as a result of a direct instruction contained in her father's letter; (2) she lied not merely to protect a loved one, but because she feared her father and was under his control; and (3) her father had an extraordinary level of control over her because of the sexual relationship between them. The evidence was prejudicial but not unfairly so.

We are also mindful of the overwhelming independent evidence of Hall's guilt, discussed below, as well as the trial court's instruction to the jury limiting its use of the challenged evidence. *See Laux v. State*, 985 N.E.2d 739, 750 (Ind. Ct. App. 2013) ("The jury is presumed to follow the trial court's instructions"), *trans. denied*. Based on the foregoing,

13

we conclude that the probative value of the challenged evidence concerning Hall's sexual relationship with B.B. was not substantially outweighed by any danger of unfair prejudice. We find no abuse of discretion here.

**Section 2 – Sufficiency of Evidence**

Hall also challenges the sufficiency of the evidence supporting his child molesting convictions. When reviewing a challenge to the sufficiency of evidence, we neither reweigh evidence nor judge witness credibility. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). Rather, we consider only the evidence and reasonable inferences most favorable to the verdict and will affirm the conviction "unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* To be sufficient, the evidence need not overcome every reasonable hypothesis of innocence. *Id.* "A victim's testimony, even if uncorroborated, is ordinarily sufficient to sustain a conviction for child molesting." *Bowles v. State*, 737 N.E.2d 1150, 1152 (Ind. 2000).

Hall was convicted of two counts of sexual misconduct with a minor. Indiana Code Section 35-42-4-9(a)(1) (2007) states that a person at least twenty-one years of age who, with a child at least fourteen but less than sixteen years of age, performs or submits to sexual intercourse commits sexual misconduct with a minor as a class B felony. Paragraph (b)(1) of the statute states that a person at least twenty-one years of age who, with a person at least fourteen but less than sixteen years of age, performs or submits to fondling or touching with intent to arouse or to satisfy the sexual desires of either the child or the older person commits sexual misconduct with a minor as a class C felony.

Hall maintains that the evidence is insufficient to establish that he performed sexual intercourse with K.F. or fondled her. K.F. testified unequivocally and specifically concerning both incidents. With respect to the first incident, she described how Hall pinned down her hands and legs and inserted his penis into her vagina. With respect to the second incident, she described how Hall inserted first his finger and then his penis into her vagina.

K.F.'s testimony alone would be sufficient to support Hall's child molesting convictions. Nonetheless, physical evidence corroborates her testimony. First, photographic evidence shows a bruise on K.F.'s wrist consistent with her testimony that Hall crossed her hands and pinned her wrists above her head. State's Ex. 5. Also, Nurse Mellon testified that during a physical examination conducted two days after the molestation, she found an abrasion on K.F.'s hymen. She reported that the injury was consistent with "blunt-force penetrating trauma" within the previous forty-eight hours. Tr. at 172. To the extent Hall maintains that the abrasion could have been from tampon use or any number of other activities, we note Nurse Mellon's explanation that the injury was consistent with penile penetration rather than tampon use and that K.F. had reported that she had not used tampons. *Id*. at 180. To the extent Hall relies on the lack of DNA evidence, we note the evidence concerning Hall's condom use during the first incident and his apparent failure to ejaculate during the second incident. Moreover, Nurse Mellon explained that DNA collection was affected by the fact that K.F. had showered twice during the intervening hours between the assaults and her medical examination (one of her showers being at Hall's request).

In short, Hall's arguments are invitations to reweigh evidence and judge witness credibility, which we may not do. K.F.'s testimony was unequivocal and was corroborated by physical evidence and by Nurse Mellon's testimony concerning the physical evidence. Also, B.B. testified that she saw Hall engaging in sexual intercourse with K.F. Thus, the evidence is sufficient to support his convictions. Consequently, we affirm.

Affirmed.

FRIEDLANDER, J., and KIRSCH, J., concur.