## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 09 2016, 5:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David T. A. Mattingly
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Robert Ramon White, *Appellant-Defendant,* | June 9, 2016 |
| v. | Court of Appeals Case No. 79A05-1509-CR-1464 |
| | Appeal from the Tippecanoe Circuit Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Thomas H. Busch, Judge |
| | Trial Court Cause No. 79C01-1503-F5-5 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Robert R. White (White), appeals his conviction for intimidation, a Class A misdemeanor, Ind. Code § 35-45-2-1; and neglect of a child, a Level 6 felony, I.C. § 35-46-1-4.

We affirm, in part, and reverse, in part, and remand for resentencing.

## ISSUES

White raises five issues on appeal, which we consolidate and restate as follows:

(1) Whether the trial court properly denied White's motion to continue;

(2) Whether the trial court properly allowed the State to exercise a peremptory strike on a potential juror;

(3) Whether the State presented sufficient evidence to sustain White's convictions; and

(4) Whether the trial court abused its discretion by not allowing White to introduce certain evidence at his sentencing hearing.

## FACTS AND PROCEDURAL HISTORY

White and T.S. lived together with their children, M.W., R.W., and A.A. (collectively, Children). On March 1, 2015, T.S. went to a bar and left the Children with White. An intoxicated T.S. returned home at approximately 11:00 p.m. and began arguing with White. Twelve-year-old M.W., who was awake at the time, sent an email to her friend informing her that her parents were quarreling. M.W. woke up her ten-year-old brother, R.W., when the argument turned violent. A.A. remained asleep the entire time.

[5] At some point, M.W. and R.W. went downstairs and saw White punch T.S., who fell and then lay motionless on the floor. Upon seeing M.W. and R.W., White commanded them to go back upstairs. White and T.S. resumed fighting, and once again, M.W. and R.W. went back downstairs. M.W. observed White hit T.S. in the face. In addition, M.W. and R.W. witnessed White pull T.S. by her hair, punch T.S. in the ribs, and slap and kick her. Thereafter, White threw a piece of glass at T.S. M.W. tried to pull White off of T.S. but White pushed M.W. into a corner and stated "don't ever touch me again" and he moved his hand as if he was going to hit her. (Tr. p. 326).

[6] M.W. became increasingly upset and she threatened to run away to her Aunt Misty's house which was about five blocks from their house. At around 3:00 a.m., wearing nothing but her pajamas pants, t-shirt, and socks, M.W. ran out the back door to Aunt Misty's house. It was cold and the ground was covered with snow. When she arrived at Aunt Misty's residence and talked to her, Aunt Misty called the police. Meanwhile, at White's and T.S.'s residence, R.W. gave T.S. a rag for her forehead since she complained of a headache. At one point, White and T.S. resumed fighting. R.W. tried to break up the fight and White hit him in the nose, causing R.W.'s nose to bleed.

[7] Officer David Chapman (Officer Chapman) of the Lafayette Police Department was dispatched to White's and T.S.'s residence in response to a domestic disturbance call. When he arrived, he heard a man and a woman arguing. After he knocked on the door, the woman identified herself as T.S., but did not let him in and spoke to him through a window. Officer Chapman observed an

injury on T.S.'s face, but because he was unable to substantiate a domestic disturbance, he left.

[8] Shortly thereafter, R.W. and T.S. left the residence and walked over to Aunt Misty's house. T.S. showed Aunt Misty her injuries but then returned to her home. At around 3:30 a.m., Officer Chapman, accompanied by another officer returned to White's and T.S.'s home due to yet another domestic disturbance call. Officer Chapman again attempted to make contact by knocking on the door. The second time around, T.S., stepped outside but was unhelpful as to what had occurred. The officers learned that M.W. and R.W. were at Aunt Misty's house and proceeding to Aunt Misty's house, briefly talked to Aunt Misty and then left.

[9] At around that same time, T.S. called her mother (Grandmother) and asked her to pick M.W. and R.W. from Aunt Misty's house. Again, between 5:00 a.m. and 6:00 a.m., the officers returned to Aunt Misty's house due to another disturbance call. The officers found White banging on Aunt Misty's door demanding to see M.W. and R.W. White had left eight-year-old A.A. home alone. Aunt Misty requested the officers to inform White that he could not have M.W. and R.W. When the officers communicated that to White, he responded by stating that he would return with a plan. The officers asked White to leave and they followed him home. Aunt Misty expressed to the officers that M.W. and R.W. were at Grandmother's house.

[10]     The Department of Child Services (DCS) was notified of the domestic disturbance call at White's and T.S.'s family home.  The following morning, at approximately 8:30 a.m., Carrie Strangle (Strangle) of DCS arrived at White's and T.S.'s home to interview the Children.  While speaking with T.S., Strangle observed that T.S. had crusted blood in her nostrils, and a little on the crease of her nose.  Strangle learned that the Children were not present in the home but were at Grandmother's house.  T.S., who seemed agitated, gave Strangle permission to interview the Children and slammed the door in her face.  Strangle also called White and sought permission to conduct forensic video interviews of the Children.

[11]     On the same day, Strangle visited Grandmother's house.  Strangle informed Grandmother that she needed to interview the Children at The Heartford House Way.[1]  A forensic interviewer, Maria Hannock (Hannock) of the Tippecanoe County Prosecutor's Office, conducted the interviews.  According to Hannock, the Children were nervous and scared.  Still on the same day, at approximately 2:30 p.m., Strangle returned to T.S.'s and White's home.  T.S.

---

[1]  In the transcripts, the name has been spelled as Hartford but the correct spelling is Heartford.  The Heartford House Way is a child advocacy center where forensic interviews of possible child victims are conducted.  *See* http://www.heartford.net/our-story/ (last visited May 9, 2016).

was more cooperative and she showed to Strangle the bruises on her ribcage. Strangle also observed that T.S. had a welt on the bridge of her nose.

[12] After the interviews were conducted, the police obtained a search warrant for T.S. and White's home. White was subsequently arrested and taken to the police station where he was read his *Miranda* rights and agreed to be interviewed. White admitted that he had previously argued with T.S. and restrained her. However, White stated that T.S.'s injuries resulted from a fall after she returned from the bar.

[13] On March 4, 2015, the State filed an Information, charging White with Count I, battery on a child, a Level 5 felony; Count II, intimidation, a Level 6 felony; Count III, domestic battery committed in the presence of a child less than 16 years of age, a Level 6 felony; and Count IV, neglect of a dependent, a Level 6 felony. At White's initial hearing on March 5, 2015, the trial court ordered the parties to conduct discovery. The State disclosed the existence of the forensic video interviews on April 21, 2015. On July 22, 2015, after White's second trial counsel signed the stipulation, the State turned over the forensic video interviews of the Children.

[14] White's trial date was set for July 28, 2015. A day before trial, White filed a motion to continue, seeking "additional time to investigate a myriad of issues that the forensic interview[s] disclosed." (Appellant's App. p. 37). On the same day, the trial court heard arguments from both sides on White's motion. White argued that he needed time to depose the Children, T.S. and Aunt Misty

because he was concerned that the Children had been coached. At the close of that hearing, the trial court denied White's motion.

[15] White's jury trial began as scheduled. At the start of trial, White renewed his motion to continue, and after hearing arguments on the motion, the trial court denied it. At the close of White's jury trial, the jury found White guilty of the lesser included offense of intimidation as a Class A misdemeanor, and neglect of a dependent, a Level 6 felony, and returned a not guilty verdict with respect to battery on a child and domestic battery committed in the presence of a child less than 16 years of age.

[16] Approximately a month before his sentencing hearing, on August 6, 2015, White filed a witness list and an exhibit for his sentencing hearing. In response, the State filed a motion to exclude the witnesses arguing that the witnesses and the exhibit had no relation or bearing on White's case. On August 28, 2015, the trial court conducted a hearing and granted the State's motion to exclude. On September 4, 2015, the trial court held White's sentencing hearing and thereafter sentenced White to concurrent sentences of 374 days for the intimidation conviction and six months for the neglect of a dependent conviction.

[17] White now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Motion to Continue*

[18] First, White asserts that the trial court abused its discretion in denying his motion for continuance a day prior to his trial. The decision to grant or deny a motion for continuance based on non-statutory grounds is left to the discretion of the trial court, and we will not reverse unless there is an abuse of that discretion. *Hamilton v. State*, 864 N.E.2d 1104, 1108-09 (Ind. Ct. App. 2007). An abuse of discretion occurs when the decision is against the logic and effect of the facts and circumstances before the court. *Id.* at 1109. A denial of a continuance is only reversible when the defendant can demonstrate that he was prejudiced by the denial. *Macklin v. State*, 701 N.E.2d 1247, 1250 (Ind. Ct. App. 1998).

[19] A day before trial, on June 27, 2015, White filed his motion to continue because he needed "additional time to investigate a myriad of issues that the forensic interview[s] disclosed." (Appellant's App. p. 37). White argued that while the State had been in possession of the forensic video interviews, it had only released the recordings six days prior to his jury trial. Due to this late disclosure, White's counsel stated that he was not in a position to sufficiently represent White. Specifically, White contended that he needed time to depose the Children since he suspected that they had been coached. At the close of the hearing, the trial court denied the motion. The following day and at the start of his jury trial, White renewed his motion to continue, making the same arguments. The State argued:

Your honor[,] the existence of the forensic interviews of all three children were disclosed with the [S]tate's discovery disclosures filed and provided to . . . [White's] first attorney of record on April 21, 2015. The [S]tate will note that the process of obtaining a forensic interview at the [Heartford] House is well known to [White's second counsel] . . . We consider them protected interviews because of the confidential nature of the interviews themselves. In order to release them[,] a stipulation has to be signed and provided to the court and filed with the court that the interviews will not be copied, will not be distributed, [and] will not be posted in anyway. That stipulation was signed on July 22,[2015]. Furthermore[,] the State will note that . . . the police report which covers about 3 pages, . . . goes into details of the allegations and what the [C]hildren said throughout their interviews. And at that point, [White's first counsel] as well as [White's second counsel] was aware of what was involved in those [Heartford] House interviews. . . . The [S]tate will note that [White's second counsel], and before him, [White's first counsel], had ample time to conduct depositions if they so wished. . . .

(Tr. pp. 49-50).

[20] In denying White's motion, the trial court stated:

I would note as well[], that the Affidavit of Probable Cause does reveal that there were interviews and describes at least from the [S]tate's point of view what the relevant statements made in the interviews were. [] I will also note that the [I]formation disclosed the names of the [S]tate's witness and their depositions could have been taken at any time after the case was filed. The court was not presented with a motion to compel and the court will incorporate its ruling from yesterday's hearing and deny the motion to continue.

(Tr. p. 50).

[21] Here, we find that White's assertion that he needed additional time to investigate a myriad of issues that the forensic interviews created is

disingenuous. The record reveals that the affidavit of probable cause, dated March 4, 2015, noted that the Children had been interviewed about the domestic violence that ensued in their family home on March 2, 2015. Further, the record shows that White gave Hancock, the forensic interviewer, permission to interview the Children. White was cognizant of the interviews at the inception of the police investigation and up to the point when formal charges were proffered against him. While it is true that White changed trial counsel during trial preparations, his second trial counsel should have followed protocol by signing the stipulation ahead of time in order to evaluate the video interviews. Issues of the Children being coached, if any, would then have been addressed prior to the trial.

[22] In addition, we find that the denial of the continuance was harmless because White was not prejudiced by his alleged lack of time to prepare. *See Macklin*, 701 N.E.2d at 1250. The record shows that when White renewed his motion at the start of his trial and the trial court denied his motion, the court invited White to prove his theory to the jury—*i.e.*, that the Children had been coached. Both M.W. and R.W. testified at his trial, and White cross-examined both children. White had all the tools he needed at his jury trial to show evidence of coaching, yet he failed to prove his claim.

[23] Overall, we conclude that none of the reasons offered by White were such that a continuance was appropriate a day prior to trial. Because White has the burden of showing that the trial court abused its discretion by denying his

request for a continuance, we will not presume prejudice. Accordingly, the trial court did not abuse its discretion in denying White's motion to continue.

## II. *Batson Challenge*

Next, White contends that the trial court erred by accepting the State's race-neutral explanation for its peremptory strike against a minority juror member of the jury venire. Generally, "a peremptory challenge may be [exercised] for no cause whatsoever." *Bond v. State*, 273 Ind. 233, 237, 403 N.E.2d 812, 816 (1980). However, in *Batson v. Kentucky*, 476 U.S. 79, 106 (1986), (extending *Batson* to cases where the defendant and excluded juror were of different races), *modified by Powers v. Ohio*, 499 U.S. 400, 405-06 (1991), the United States Supreme Court qualified that principle to preclude the use of peremptory challenges to exclude venire persons from a jury solely on the basis of race. In *Batson*, the Court "determined that the prosecutor's use of a peremptory challenge to strike a potential juror solely on the basis of race violated the Equal Protection Clause of the Fourteenth Amendment." *Jeter v. State*, 888 N.E.2d 1257, 1262 (Ind. 2008). *Batson* set forth a three-step test to determine whether the State has improperly used a peremptory challenge to strike a juror from the venire solely because of that individual's race. First, the party contesting the use of a peremptory challenge must make a *prima facie* showing of discrimination based upon race against the member of the venire. *Batson*, 476 U.S. at 96–97. Next, the party using a peremptory challenge may "present a race-neutral explanation for using the challenge." *Jeter*, 888 N.E.2d at 1263. If the party seeking to strike a member of the venire provides a race-neutral

explanation, "the trial court must then decide whether the challenger has carried its burden of proving purposeful discrimination." *Id.*

[25] Because of the importance of the demeanor of potential jurors and the prosecutor when the trial court evaluates a race-neutral explanation for a peremptory challenge, we afford broad latitude to the trial court's decision in such matters. *Killebrew v. State,* 925 N.E.2d 399, 401 (Ind. Ct. App. 2010), *trans. denied.* Upon appellate review, we will set aside the trial court's decision concerning whether a peremptory challenge is discriminatory only if it is found to be clearly erroneous. *Forrest v. State*, 757 N.E.2d 1003, 1004 (Ind. 2001).

[26] At the close of the jury selection process, the trial court read out the names of the juror members. Among them was Juror no 1397, K. Ramirez (Ramirez). At that point, the State informed the trial court that it had exercised its peremptory strike on venire person Ramirez. In response, the trial court stated, in part, "[S]ince her last name is Ramirez do you believe we [] have a *[Batson]* issue[?]" (Tr. p. 135). At that moment, White's counsel lodged a *Batson* objection. Accordingly, the State explained that Ramirez had disclosed in her juror questionnaire that she had been in a "domestic situation before" and was previously convicted of possessing cocaine eleven years ago and had served probation. (Tr. p. 135). At the close of the *Batson* hearing, the trial court found the State's race-neutral explanations credible.

[27] We note that "[a] neutral explanation means 'an explanation based on something other than the race of the juror.'" *McCormick v. State*, 803 N.E.2d

1108, 1111 (Ind. 2004) (quoting *Hernandez v. New York*, 500 U.S. 352, 360, (1991)). "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Addison v. State*, 962 N.E.2d 1202, 1209 (Ind. 2012) (quoting *Purkett v. Elem,* 514 U.S. 765, 768, (1995)).

[28] After the *Batson* challenge, the State gave two neutral reasons for striking Ramirez from the jury venire. The first was because Ramirez had been in a domestic situation, and the second was due to her prior criminal history. Although the trial court's evaluation of step three was transitory, we find that it sufficiently satisfied the three-part step process under *Batson*. On step three, the trial court found that the State's race-neutral explanations were credible, and there is nothing in the record to indicate that the State's reasons were merely pretextual. In our review of the State's explanation, we do not find any racial motivation on the State's part in striking Ramirez as juror. Accordingly, White has not carried his burden to show purposeful discrimination. We therefore conclude that the trial court's decision in this regard is not clearly erroneous.

### III. *Sufficiency of the Evidence*

[29] White argues that there was insufficient evidence to sustain his convictions for neglect of a dependent and intimidation. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id.* We will affirm if there is

substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id.*

## A. *Neglect of a Dependent*

[30] In the instant case, the State filed an Information alleging

> On or about March 1, 2015, through March 2, 2015, in Tippecanoe County, [] White, a person having the care of dependent, to wit: M.W. (12 years of age), R.W. (10 years of age,) and /or A.A. (8 years of age), whether assumed voluntarily or because of legal obligation, did knowingly and intentionally place M.W., R.W., and /or A.A. in a situation that endangered his/her life or health.

(Appellant's App. p. 11). For the State to convict White of neglect of a dependent, as charged, it was required to prove that White, having care of M.W., R.W. or A.A., whether voluntarily or because of a legal obligation, did knowingly or intentionally place the dependents in a situation that endangered their life or health. *See* I.C. § 35-46-1-4.

[31] The purpose of the neglect statute is to protect a dependent from the failure of those entrusted with his or her care to take the action necessary to ensure the dependent is safe. *Harrison v. State*, 644 N.E.2d 888, 891 (Ind. Ct. App. 1994), *trans. denied*. In *Harrison*, we concluded that the meaning of the word "health," as it relates to the child neglect statute, "is not limited to one's physical state, but includes an individual's psychological, mental and emotional status." *Id.* With respect to the knowledge required to support a neglect conviction, the question is whether the defendant was subjectively aware of a high probability that he placed the dependents in a situation involving an actual and appreciable

danger to them. *Id*. Such danger arises when dependent children are exposed to some risk of physical or mental harm that goes significantly beyond the "normal risk of bumps, bruises, or even worse that accompany the activities of the average child." *Gross v. State*, 817 N.E.2d 306, 309 (Ind. Ct. App. 2004).

[32] The record shows that on the early morning of March 2, 2015, White was engaged in a physical altercation with T.S. M.W. and R.W. observed White punch, hit, and kick T.S. Although White was found not guilty of domestic battery committed in the presence of a child, it does not negate the fact that M.W. and R.W. witnessed the battery. Upset by her parents quarreling, a little after 3:00 a.m., twelve-year-old M.W., ran to her aunt's house five blocks away. M.W. only wore pajama pants, a t-shirt, and socks. R.W. followed his sister about thirty minutes later, but he was accompanied by T.S. Thereafter at around 5:00 a.m., leaving behind eight-year-old A.A., White walked to Aunt Misty's house to retrieve M.W. and R.W.

[33] White argues that the State did not offer any evidence that he was subjectively aware that M.W. ran away from home without a winter coat or shoes, therefore, he did not place her in any appreciable danger. We agree with White that the State did not offer any evidence that he was subjectively aware that M.W. had left the house dressed as she had, thus placing her in any appreciable danger on that cold winter morning. The record shows that during the parent's altercation, M.W. proclaimed that she would run away to Aunt Misty's house. White told M.W., "No you are not." (Tr. p. 322). Unbeknownst to White, M.W. ran out through the back door.

[34] Ultimately, the burden did rest with the State to prove that White was subjectively aware of a high probability that he placed M.W. in a situation involving an actual and appreciable danger. Looking at the record before us, we agree with White that the State failed to develop testimony from any of the witnesses it called, that White knew M.W. had left the house when she did, or he was mindful of how M.W. was dressed. While it is not wise for a twelve-year-old to be on the streets at 3:00 a.m., no evidence was offered that M.W. suffered any harm when she ran to Aunt Misty's house. The record shows that Aunt Misty welcomed M.W. to her house and thereafter called the police.

[35] White further claims that the State failed to meet its burden of showing actual and appreciable danger because A.A. remained unharmed and undisturbed that night as he walked to Aunt Misty's house to retrieve M.W. and R.W. In determining this issue, we are mindful of the holding in *Scruggs v. State*, 883 N.E.2d 189, 190 (Ind. Ct. App. 2008), *trans. denied*. There, the defendant left her seven-year-old son, M.H., at home while she ran an errand. *Id*. When she returned approximately three hours later, he was missing. *Id*. M.H. was later found safe at the defendant's boyfriend's uncle's home, but the defendant was charged and subsequently convicted of neglect of a dependent. *Id*. On appeal, this court concluded the evidence was insufficient to establish the defendant had a "subjective awareness of a 'high probability' that M.H. was placed in a dangerous situation when she left him home alone." *Id*. at 191. M.H. was seven years old, the defendant testified M.H. knew "not to mess with the stove or open the door or anything," and the State failed to present any evidence

contradicting the defendant's evidence that suggested M.H. was responsible enough to be home alone. *Id*. Because the only evidence presented suggested M.H. was responsible enough to be left at home, we concluded there was insufficient evidence that the defendant was subjectively aware of a high probability that M.H. was placed in a dangerous situation. *Id*.

[36] In *Thames v. State*, 653 N.E.2d 517 (Ind.Ct.App.1995), on the other hand, we concluded sufficient evidence was presented to support the defendant's conviction of neglect of a dependent after the defendant left his girlfriend's five-year-old daughter alone and the child wandered out of her home and was eventually taken to the police department. Although the defendant was only a few houses away from the child, he was gone for several hours and the child was found wandering the street. *Id*. We concluded the defendant "was experienced at watching children and thus should have been subjectively aware of a high probability that he placed [the child] in a dangerous situation by leaving her at home." *Id*.

[37] In the instant case, the record shows that between 5:00 a.m. and 6:00 a.m., on March 2, 2015, the officers were dispatched to Aunt Misty's house because White was banging on her door demanding to have his children. When the officers arrived, they resolved the matter by requesting White to go home and the officers followed White home. The record is absent any showing that A.A. woke up that night, let alone walked outside the residence. In *Scruggs*, 883 N.E.2d at 190, we declined to adopt the *per se* rule that merely leaving a seven-year-old child home alone for any period of time constituted neglect, and

considered the facts and circumstances surrounding the case. In light of the foregoing, we find that the State failed to meet its burden of showing that White exposed A.A. to actual and appreciable danger since A.A. remained unharmed and undisturbed that night while he walked to Aunt Misty's house.

[38] The State further claims that witnessing a domestic dispute, and the fact that M.W. and R.W. both had to flee their family home at 3:00 a.m. in a cold winter night, is sufficient to prove that White subjectively placed M.W.'s and R.W.'s emotional health in actual and appreciable danger. We disagree. Other than the fact that the children were upset by their parents fighting, the State did not offer any evidence, that the events of that night rose to this level of emotional harm referred to in the neglect statute.

[39] As we observed in *Gross*, 817 N.E.2d at 311, "[t]here is admittedly a fine line between properly exercising the police power to protect dependents and improperly subjecting every mistake a parent may make in raising his or her child to prosecutorial scrutiny." Here, White admittedly argued with T.S. in front of the Children and that argument turned violent. M.W. and R.W., who observed the domestic dispute, were upset from the events. M.W. ran away against White's reprimand and White was subjectively unaware the she had run away. At around 5:00 a.m., White walked to Aunt Misty's house to retrieve M.W. and R.W. While White may have demonstrated bad judgment, leaving A.A. home alone, the State did not prove beyond a reasonable doubt that White had a subjective awareness of a high probability that he had placed A.A. in a dangerous situation. We agree with White that the State failed to prove the

*mens rea* element of the crime. *See Martin v. Ohio*, 480 U.S. 228, 238 (1987). Accordingly, we reverse White's conviction.

## B. *Intimidation*

[40] White also challenges the sufficiency of his conviction for a Class A misdemeanor intimidation as a lesser-included offense of Level 6 felony intimidation. In the instant case, the State charged White with Level 6 felony intimidation stating

> "[O]n or about March 1, 2015, through March 2, 2015, in Tippecanoe County, [] White, did knowingly or intentionally communicate a threat to commit a forcible felony to another person, to wit: M.W. and/or R.W. with the intent that M.W. and /or R.W. be placed in fear of retaliation for a prior lawful act."

(Appellant's App. p. 10).

[41] To show that White committed intimidation, as a Class A misdemeanor, the State was required to show, first, that White "communicate[d] a threat" to M.W. and/or R.W. and, second, that he did so with the intent that M.W. and/or R.W. "be placed in fear of retaliation for a prior lawful act." I.C. § 35-45-2-1 (2013).

[42] Here, the first question under the intimidation statute is whether White "communicate[d] a threat." I.C. § 35-45-2-1(a). In the instant case, the events surrounding the crime were that M.W. and R.W. witnessed a domestic altercation between their parents. M.W. saw White punch, kick, and pull T.S.'s hair. At some point, M.W. tried to disrupt the fight by pulling White away

from T.S. In turn, White backed M.W. into a corner and barked, "[D]on't ever touch me again." (Tr. p. 326). White then gestured his hand as if he was going to hit M.W. Also, R.W. tried to break up the fight between his parents. An angry White hit R.W. in the nose causing him to bleed.

[43] White first argues that his threat to M.W., "don't ever touch me again" was conditional and that any other evidence concerning whether he intended his threat to place M.W. in fear of retaliation for a prior lawful act is irrelevant. (Tr. p. 326). In support of that analysis, White notably cites *C.L. v. State*, 2 N.E.3d 798, 801 (Ind. Ct. App. 2014).

[44] In *C.L.,* the defendant wanted about $1,700 from his grandfather so that he could purchase a car. *Id*. At some point, the defendant became "huffy and puffy," and told his grandfather that he would "beat the heck out of" him if he "didn't get the money" for the car. *Id*. The defendant also told his grandfather that if he "ever got sent to jail and . . . [got] out, [that he would] kill him." *Id*. Also, the defendant stated that he would kill others, including his mother and brother. *Id*. This court determined the defendant's threats of violence were conditional and aimed at future conduct. As a result, the defendant's threats of violence were not made in retaliation against the prior lawful acts of the victim. *Id*. at 801. Under the reasoning of *C.L.*, no defendant can be convicted of intimidation if he has the presence of mind to explicitly use conditional language in the course of communicating his threat to another. *Roar v. State*, No. 49A02-1506-CR-506, at *4 (Ind. Ct. App. Apr. 21, 2016). We, however, find that is an unreasonable interpretation of our intimidation statute. *Id*.

Threats are, by definition, expressions of an intention to do a future thing, and, thus, to some degree, all threats are conditional. *See* I.C. § 35-45-2-l(d). And once the facts demonstrate that the defendant communicated a threat, the only question left is whether the defendant did so "with the intent" to place the victim "in fear of retaliation for a prior lawful act." I.C. § 35-45-2-1(a)(2). Mere use of conditional language in the course of communicating a threat does not vitiate the statute's application when the factual predicate for the threat was a prior lawful act of the victim. Stated another way, the language a defendant uses in communicating a threat may be relevant to the fact-finder's assessment of the defendant's intent, but the language used is not the only relevant consideration.

*Id*. White's argument on appeal is such that we weigh his threat to M.W. as conditional while simultaneously discrediting all other evidence. We will not reweigh the evidence on appeal. The jury was capable of discerning whether intimidation occurred where, as here, there is a clear nexus between the prior lawful act and the threat. White verbally communicated a conditional threat to M.W., and he further accompanied that threat with his body-language—lifting his hand as if he was going to hit M.W. Secondly, both threats—verbal and body language—were communicated directly after M.W. committed a prior lawful act, which was an attempt to break up the fight between her parents. Accordingly, we affirm White's intimidation conviction.

## V. *Order Excluding Evidence at Sentencing Hearing*

[45] Lastly, White argues that the trial court erred by denying him the opportunity to present certain evidence at his sentencing hearing. As such, White claims that his Fifth and Fourteenth Amendment rights under the United State Constitution and I.C. § 35-38-1-3 were violated.

[46]    The Fifth and Fourteenth Amendments of the U.S. Constitution provide in part that no person shall be "deprived of life, liberty, or property, without due process of law[.]"  Further, Indiana Code Section 35-38-1-3 states:

> Before sentencing a person for a *felony*, the court must conduct a hearing to consider the facts and circumstances relevant to sentencing. The person is entitled to subpoena and call witnesses and to present information in his own behalf.  The court shall make a record of the hearing, including:
>
> (1) a transcript of the hearing;
> (2) a copy of the presentence report; and
> (3) if the court finds aggravating circumstances or mitigating circumstances, a statement of the court's reasons for selecting the sentence that it imposes.

(emphasis added).  The record shows that on August 6, 2015, White filed a witness list and an exhibit for his sentencing hearing.  The witnesses were names of two Lafayette police officers, and the exhibit was a reference to a motion filed in unrelated case—*i.e.,* "*United States v. Samuel Bradbury*"—with no cause number or citation provided.  (Appellant's App. p. 90).  On the same day, the State filed a motion to exclude the officers as witnesses and the exhibit, arguing that the evidence had no bearing on White's case.  Still on the same day, White filed a reply, arguing that the police officers were relevant to the intimidation charge as "the State of Indiana has refused to prosecute these witnesses for far worse statements made to an individual;" and that "*United States v. Samuel Bradbury* involves the witnesses . . . and it will assist the [c]ourt in showing how the State is treating allegations of intimidation differently as to

other different citizens." (Appellant's App. p. 87). On August 28, 2015, the trial court issued an order granting the State's motion to exclude the evidence.

[47] In support of his argument, White cites *Wilson v. State*, 865 N.E.2d 1024, 1029 (Ind. Ct. App. 2007). Wilson was convicted of murder and a misdemeanor handgun offense. *Id*. He appealed because the trial court would not allow him to present personal information—*e.g.*, family history, employment history, mental health history—at his sentencing hearing. *Id*. Upon review, we held that because a convicted person is entitled to subpoena and call witnesses at their sentencing hearing, the trial court did in fact violate the statute and Wilson's federal due process rights by refusing to admit evidence presented on Wilson's behalf through the testimony of others at the sentencing hearing. *Id*.

[48] We note that the "purpose of the sentencing hearing is to give the trial court the opportunity to consider the facts and circumstances relevant to the sentencing of the individual defendant before it. *Page v. State*, 424 N.E.2d 1021, 1023 (Ind. 1981). The trial court should determine those facts and circumstances by referring to the entire record of the proceedings, which includes the testimony and evidence given at trial. *Id*. Here, the evidence that White intended to present did not show that he deserved a lenient sentence; rather, he attempted to show that he should not have been charged, let alone convicted of the intimidation offense.

[49] Notably, the right to present evidence and call witnesses exists only for persons convicted of felonies. *See* I.C. § 35-38-1-3. Because White's evidence—

witnesses and an exhibit—related to the misdemeanor intimidation conviction, the holding in *Wilson* does not support White's request for relief.

[50] Because the evidence presented by White did not relate to his case nor was it intended to convince the trial court that he deserved a lenient sentence, and coupled with the explicit statutory language of Ind. Code § 35-38-1-3, we agree with the State that White has not demonstrated error in his sentencing or that the trial court's procedure violated his right to due process. Accordingly, we affirm White's sentence, but only with respect to his intimidation conviction.

## CONCLUSION

[51] In light of the foregoing, we conclude that (1) the trial court properly denied White's motion to continue; (2) the trial court properly allowed the State to exercise a peremptory strike on a potential juror; (3) there was insufficient evidence to sustain White's conviction for neglect of a dependent; however, there was sufficient evidence to sustain White's intimidation conviction; and (4) the trial court did not abuse its discretion for excluding White's proffered evidence at his sentencing hearing.

[52] Affirmed, in part, and reversed, in part, and remanded for resentencing.

[53] Kirsch, J. concurs

[54] Pyle, J. concurring and dissenting with separate opinion

# IN THE
# COURT OF APPEALS OF INDIANA

Robert Ramon White,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellees-Plaintiffs.*

Court of Appeals Case No.
79A05-1509-CR-1464

**Pyle, Judge.**

[55] I respectfully dissent from my colleague's decision to reverse White's conviction for neglect of a dependent. In my opinion, there is sufficient evidence from which a jury could infer White's intent to commit the offense. In all other respects, I concur.